## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

BRADLEY W. FOSTER,                                Case No. 19-cv-260 (JNE/ECW)

        Plaintiff,

     v.                                       **REPORT AND RECOMMENDATION**

MARK PHINNEY,

        Defendant.

This matter is before the Court on Defendant Mark Phinney's Motion for Summary Judgment. (Dkt. 88.) This case has been referred to the undersigned United States Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons discussed below, the Court recommends that Defendant Mark Phinney's Motion for Summary Judgment be granted.

### I.    FACTUAL AND PROCEDURAL BACKGROUND

**A.    Plaintiff's Civil Commitment Status**

In 2007, the state district court in Hibbing determined that Plaintiff Bradley Foster was a sexually dangerous person with a sexual psychopathic personality and civilly committed him to the Minnesota Sex Offender Program for an indeterminate period at a Moose Lake, Minnesota facility (hereinafter "MSOP") pursuant to the Minnesota Commitment and Treatment Act ("MCTA"), Minn. Stat. § 253.B185, as a "sexually psychopathic personality" and "sexually dangerous person." (Dkt. 92-1; *see also* Dkt.

92-2.)  Foster remains civilly committed by the MSOP and acknowledges that he is "indeterminately committed for sexual dangerousness."  (Dkt. 1 ¶ 8; Dkt. 109 ¶ 6.)[1]

**B.    Court Order Authorizing Foster's August 3, 2015 Transportation**

In July 2015, a St. Louis County district judge issued a Writ of Habeas Corpus which authorized Foster's transport to attend a motion hearing on a motion for injunctive relief brought by Foster:

> The Respondent, Bradley Wayne Foster, has filed a Motion for Injunctive Relief and Other Relief.  The Respondent is at the present time in the custody of the Commissioner of Human Services with placement at the Minnesota Sex Offender Program, Moose Lake site.  A Motion hearing is scheduled August 3, 2015 at 1:30 p.m. in St. Louis County Court, Hibbing, Minnesota on Respondent's Motion.
>
> **NOW, THEREFORE, IT IS ORDERED:**
>
> That pursuant to Minn. Stat. §589.35, the Commissioner of Human Services shall release said Respondent to **Ross Litman, Sheriff** of St. Louis County or his authorized agent.  That the Respondent will be transported to the St. Louis County Jail where said Defendant will be lodged **without bail** so that he may appear at the motion hearing noted above.  That the St. Louis County Sheriff's Department shall return Respondent to the custody of the Commissioner of Human Services upon completion of his Court appearance. The deputy may be in uniform.  To the extent feasible, the Sheriff shall transport Respondent to and from the hearing on the same day.  If that is not possible, Respondent is to be held in jail for not more than 24 hours.

(Dkt. 92-3 (emphasis in original).)

---

[1]    Page numbers refer to the CM/ECF system's pagination unless otherwise indicated.

**C.    Foster's August 3, 2015 Transportation to St. Louis County Court by Deputy Phinney**

Defendant Deputy Mark Phinney ("Deputy Phinney" or "Defendant"), who previously served as Deputy Sheriff for the St. Louis County Sheriff's Office, performed the transport at issue in this case on August 3, 2015.  (Dkt. 93 ¶¶ 3, 6.)

Deputy Phinney asserts that he had no recollection of the transport at issue in this case, but was "sure I followed" his own shackling practices set forth in Section I.E.1 of this Report and Recommendation.  (*Id.* ¶ 9.)  The transport log filled out by Deputy Phinney showed that he transported Foster departing from Moose Lake at 11:45 a.m. and that they arrived at the courthouse at 1:25 pm.  (Dkt. 93-1.)  Foster was transported back to Moose Lake starting at 2:15 p.m. with an arrival time at Moose Lake of 3:45 p.m.  (*Id.*)  The distance traveled was approximately 83 miles each way.  (*Id.*)  Other than the milage traveled, there were no other relevant notes made regarding the trip.  (*Id.*)

In his Declaration, Foster asserts he was transported four separate times during his civil commitment by the St. Louis County Sheriff's Department.  (Dkt. 109 ¶ 9.)  He was twice transported in a Dodge Caravan minivan and a third time he was transported in a squad car—both vehicles he claims were upholstered and had "conventional springs." (*Id.* ¶¶ 10-11, 13.)  In the fourth transport, the one at issue in this case, Foster asserts that he was transported in a 2014 Ford E350 Van.  (*Id.* ¶¶ 12, 14.)  Foster does not represent that he wore seatbelts or other safety restraints during any of these transports.

According to Foster, when the leg irons were placed on him, he was in a kneeling position on a chair facing a wall and did not realize how tight the leg irons were until he stood up.  (*Id.* ¶¶ 20-21.)  Foster claims that he told Deputy Phinney and other unnamed

MSOP staff that his leg irons were tight, to which Deputy Phinney, without checking the leg irons, stated that he would "be just fine.  You only have a little ways to go to the vehicle."  (*Id.* ¶¶ 22-23.)

Foster claims in his Declaration that when he was brought to the transport van, he asked whether the van was only for him and that Deputy Phinney responded that he had to pick up other prisoners.  (*Id.* ¶¶ 24-25.)  However, he was the only person transported for the entire trip.  (*Id.* ¶ 16.)

Foster asserts that he was placed by Deputy Phinney into a compartment of the van that was approximately three and a half feet wide and seven feet long with bare aluminum benches.  (*Id.* ¶¶ 14, 18-19.)  Indeed, Foster was transported in an unmarked 2014 Ford E-35 van in a compartment which did not contain any seatbelts or other safety restraints.  (Dkt. 94 ¶ 12; Dkt. 94-2 at 2-8, 15-29; Dkt. 113 ¶¶ 9-10.)  The compartments of the vehicle appear to be primarily metal, with a metal bench and floor.  (Dkt. 94-2 at 15-19.)

As Foster was climbing into the van, he maintains that he told Deputy Phinney again that his restraints were tight and asked whether they could be loosened.  (Dkt. 109 ¶ 26.)  Deputy Phinney did not respond and never checked on the tightness of the leg irons.  (*Id.* ¶¶ 26-27.)

Foster further states in his Declaration the ride "was horrible" because the springs in the van were stiff causing him to bounce around even on smooth highway and that the compartment in which he was transported "had bare aluminum benches where I was

forced to raise his legs and press my feet to the partition wall in front of me to keep from falling." (*Id.* ¶¶ 12, 14-15.)

Foster made no requests for removal or loosening of the restraints before the St. Louis County judge on August 3, 2015, nor any other complaints related to his restraints or transport. (*See* Dkt. 92-4.)

## D.    Injuries Suffered by Foster

With respect to his claimed injuries, Foster claimed in his interrogatory answer that he suffered physical injuries to his ankles causing them to bleed, the pain of having to walk in overly tightened leg restraints, headache after the transport, and back pain from being "tossed around" during his transport. (Dkt. 92-13 at 4-5.) Foster also claimed emotional pain and humiliation. (*Id.* at 5.) With respect to the medical care he received as the result of Deputy Phinney's actions, Foster noted that he sought medical attention for the "abrasions" he suffered. (*Id.* at 6.) He provided no other evidence of the treatment he received as a result of the transport nor does it appear that he produced any documents demonstrating his injuries. (Dkt. 94 ¶¶ k-m; Dkt. 92-13 at 6, 8-11.)

A MSOP official did prepare an incident report on August 3, 2015, which provided in relevant part as follows:

> On 8/3/2015, at about 1720 hours, while working on complex I E, client Bradley Foster approached the desk and asked if anything could be documented about the open sores on the back side of his ankles. Client Foster was on a transport today and had ankle restraints on. I looked at client Foster's ankles and noticed an open sore, along with blood, on the back sides of his feet, along with a vertical mark about two inches long. I called health services and informed client Foster that they would try to call him down around 1830 hours. Client Foster stated that he tried to clean up these areas as best as he could, and also applied Band Aides to the sores.

(Dkt. 92-5.)

**E.     St. Louis County Sheriff's Office Policies with Respect to Transportation**

**1.     Use of Restraints**

St. Louis County Sheriff's Office has adopted a policy of "Prisoner Handling and

Restraints" (hereinafter the "Policy"), which was in effect on August 3, 2015.  (Dkt. 94

¶ 5.).  The Policy provides in relevant part as follows:

> It shall be the policy of the St. Louis County Sheriff's Office to restrain all
> prisoners when they are not within the security perimeter of the County Jail
> or other County holding facility.
>
> * * *
>
> Probate Transport will be handled according to current Minnesota State Law.
>
> * * *
>
> Officer Discretion: Transporting Deputy(ies) have the authority to deviate
> from the rules, policies and procedure when, in their estimation, the rules,
> policies and procedures would jeopardize the mission of the transport.  When
> there is deviation, it is mandatory to submit a written report to the Transport
> Sergeant or his/her designee.  The Transport Sergeant will then submit the
> report to the Lt. of Court Services or the Supervising Deputy.  This report
> shall cite the Rule, Policy or Procedure that was deviated from and the
> rational for such deviation.
>
> **Procedure:**
>
> Court Transportation Procedures:
>
> Prisoners will be handcuffed, waist chained, and shackled throughout the
> court procedure unless otherwise ordered by the Judge.  If the prisoner is
> going to a jury trial or Court trial, the restraints shall be removed behind
> closed doors and out of the sight of the jury or Judge.

(Dkt. 94 ¶¶ 6, 8; Dkt. 94-1 at 2-3.)  According to Deputy Sheriff Lieutenant David Rolland, who is responsible for overseeing the transport operations of the St. Louis County Sheriff's Office, the requirement of the use of restraints—namely, handcuffs, a chain, and leg irons (also known as shackles)—whenever a person was outside of the secure perimeter of the St. Louis County Jail or another county holding facility, including during transports to and from courts, is without an individualized determination of risk.  (Dkt. 94 ¶ 7.)  With respect to the use of restraints in court, Deputy Lt. Rolland represented that it is rare for a court to order the removal of restraints, and he was not aware of any instance in which a court has ordered the removal of leg irons.  (*Id.* ¶ 9.)  Foster provides no evidence nor makes any assertion that he asked the St. Louis County judge to remove his leg irons for any reason.  (*See also* Dkt. 92-4.)

> According to Deputy Lt. Rolland, the purpose for using of restraints is as follows:
>
> The main reason we required and still require the use of restraints during transports and court proceedings other than trials is to protect the safety of persons in our custody, law-enforcement officers, court staff, and the public. Without the use of restraints, it would be easier for transported persons to escape, to harm themselves, to harm others around them, and also to damage our transport vehicles and other property.  We have had at least one transport-related escape attempt during my tenure at the St. Louis County Sheriff's Office.
>
> Leg irons are essentially the same as handcuffs, with the obvious exception that they are secured around a person's ankles rather than their wrists.

(Dkt. 94 ¶¶ 10-11.)  While the Policy references prisoners, Deputy Lt. Rolland represented that the Policy also applied to patients in the MSOP.  (*Id.* ¶ 6.)

> Deputy Phinney represented that:
>
> As of August 3, 2015, based on my training and experience as a law-enforcement officer, including my training and experience as a Deputy

> Sheriff in the St. Louis County Sheriff's Office, I understood that there should be a one-finger gap between a person's ankles and shackles (also known as leg irons). I consistently followed this practice throughout my tenure as a law-enforcement officer.
>
> As of August 3, 2015, based on my training and experience as a law-enforcement officer, including my training and experience as a Deputy Sheriff in the St. Louis County Sheriff's Office, I also understood that if a person said the shackles were too tight, I should check them and either confirm they were not too tight or make any necessary adjustments to correct the problem. I consistently followed this practice throughout my tenure as a law enforcement officer as well.

(Dkt. 93 ¶¶ 6-7.) Deputy Phinney asserted that from September 2006 to September 2018 alone, he shackled approximately ten persons per working day, or approximately 31,200 persons in total and that as far as he knew, nobody other than Foster has ever complained that he injured them by making their shackles too tight or by any other means. (*Id.* ¶ 8.)

Deputy Lt. Rolland claimed that aside from Foster's complaint in this case, he is not aware of any complaint that Deputy Phinney injured anyone by making their leg irons too tight or by any other means. (Dkt. 94 ¶ 20.)

## 2. Use of Seatbelts or other Safety Measures During Transportation

Deputy Lt. Rolland asserted that transports do not utilize seatbelts or other safety restraints for transportees because transported persons could use the buckles and straps to harm themselves, other transported persons, and officers. (Dkt. 94 ¶ 17.) He further asserted that, given the space constraints and configuration of the rear compartments of St. Louis County Sheriff's Office's transport vans, if officers had to enter the compartments to assist prisoners with seatbelts or other safety restraints, the officers and their equipment, including weapons, could be placed in a vulnerable position. (*Id.* ¶ 18.)

The Policy also sets forth the following additional instructions with respect to

Probate transports:

<u>Probate Transports</u>:

The following Minnesota Statutes shall be applied in transporting and handling individuals under probate commitment:

a. 252.06; Sheriff to Transport Persons with Mental Retardation: "It shall be the duty of the Sheriff of any county, upon request of the commissioner of human services, to take charge of and transport any person with mental retardation who has been committed by the probate court of any county to the care and custody of the commissioner of human services to such hospital as may be designated by the commissioner of human services."

b. 253B.05 (Subd 2) Ref: Peace Officer 72 hour Hold: States in part: "A peace or health officer may take a person into custody and transport the person to a licensed physician or treatment facility if the officer has reason to believe that the person is mentally ill or mentally retarded, or chemically dependent or intoxicated and in imminent danger of injuring self or others if not immediately restrained."

c. 253B.O7 (Subd 6) Ref: Judicial Probate Commitments: States in part: "the court may order a peace officer to take a proposed patient into custody and transport to a treatment facility. The order of the court may be executed on any day and at any time, and by use of all necessary restraint upon the proposed patient."

d. 253B.10 (Subd 2) Procedures for Commitment: States in part: "When a mentally ill or chemically dependent person is about to be placed in a treatment facility, the county may order the designated agency, the treatment facility, or any responsible adult to transport the patient to the treatment facility. Unless otherwise ordered by the court, a peace officer who provides the transportation shall not be in uniform and shall not use a vehicle visibly marked as a police vehicle. The proposed patient may be accompanied by one or more interested persons."

e. 253.11 Ref: Mentally Ill or Chemically Dependent Persons NOT Charged with a Crime: States in part: "Except when ordered by the court pursuant to a finding of necessity to protect the life of the proposed patient or others, no person subject to the provisions of this chapter shall be confined in a jail or correctional institution."

Use of Restraints on Probate patients:
Transport Deputy(ies) shall assess the type, and amount of restraints to be used for each patient prior to transport. The Transport Deputy(ies) may contact the Medical Facility to ascertain what type of restraints, if any, are required.

(Dkt. 94-1 at 6-8.) According to Deputy Lt. Rolland, the probate-transfers provision applied to the kinds of transports listed in items a–e of the provision; it did not apply to transports of committed persons in the MSOP to or from court. (Dkt. 113 ¶¶ 5-6.)

With respect to transportation, Deputy Lt. Rolland stated that on average, the St. Louis County Sheriff's Office completes approximately 52 terminal-to-terminal transports per week, which translates into approximately 225 transports per month, or approximately 2,704 transports per year, involving more than 220,000 total miles on the office's transport vehicles. (Dkt. 94 ¶¶ 13-14.) Deputy Lt. Rolland, in his role of overseeing transport operations, also represented that from July 2009 through August 3, 2015, the date of the transport at issue in this case, he did not see or hear about a single report of any person suffering or allegedly suffering any injury during a transport, including transports in van compartments, and that given his role during that period, if there had been such a report, he would have seen or heard about it. (*Id.* 4, 15-16; Dkt. 113 ¶¶ 7-8, 10.)

## F.    Procedural Background in the Present Matter

In Count I of the Complaint, Plaintiff alleges that Defendants' actions in their individual and official capacities "retained, implemented, and carried out acts and procedures that violated Minnesota Statutes resulting in violation of Plaintiff's Fourth and Fourteenth Amendment rights to be free from excessive force, and/or use

of force, and in deliberate indifference to Plaintiff's needs, pain and suffering." (Dkt. 1 ¶ 26.) Plaintiff alleges that the unreasonable use of the restraints, which he describes as a "Black Box Restraint System" ("BRS") led to a direct and proximate cause of Plaintiff's physical injuries resulting in physical pain, anguish, and emotional harm that is tantamount to punishment in violation of clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article 1, Section 2 of the Minnesota Constitution. (*Id.* ¶ 27.) Plaintiff claims that Defendants should have been aware of the proper and legal procedure of transporting a civil committee when Deputy Phinney, under the direct supervision of Defendant Ross Litman, the St. Louis County Sheriff, in this instance, prevented Plaintiff from receiving proper care and treatment while in the Defendants' custody; did nothing to change or to prevent this conduct and physical injuries caused to Plaintiff by this conduct from occurring; and actively participated in the cause of the conduct alleged above. (*Id.* ¶¶ 9, 28-29.)

In Count II, Plaintiff asserts a claim for "Failure to Follow and abide by Minnesota Statutes to Transport Plaintiff in an Unmarked Vehicle Resulting in Injury of the Plaintiff in Violation of the United States Constitution: Fourth Amendment to Be Free Form [sic] Excessive Force; Fourteenth Amendment to due process; and Minnesota Constitution: Article I, Section 2, Plaintiff was Disfranchised and Deprived of Rights or Privileges." (*Id.* at 13.) In particular, he claims that transporting him in a marked vehicle with no cushioned seats, seatbelts, windows, or adequate light, in violation of Minnesota law, violates the Fourth and Fourteenth Amendments of the United States Constitution

and Article I, Section 2 of the Minnesota Constitution.  (*Id.* ¶ 36.)  Plaintiff asserts that Defendants should have been aware of the proper and legal procedure of transporting a civil committee when Deputy Phinney, under the direct supervision of Sheriff Litman, in this instance, prevented Plaintiff from receiving proper care and did nothing to change or prevent this conduct.  (*Id.* ¶ 37.)

In Count III, Plaintiff claims that Defendants failed to make a reasonable accommodation for him as a civil committee by forcing him to walk more than 40 yards in the BRS and then up a flight of stairs and down a 20-foot corridor to attend a court hearing, thereby causing him humiliation, pain, and physical/emotional suffering in violation of his Fourth Amendment right to be free from excessive force; his Fourteenth Amendment right to due process; and the Minnesota Constitution, Article I, Section 2. (*Id.* at 15.)  In particular, Plaintiff asserts that the Fourth Amendment protection against excessive force "includes protection from personal and physical harm to [an] individual civil committee's right to be free from a BRS in situations where [the] individual's security risk is low" and that the "BRS causes physical injury when used improperly, or otherwise when used by persons untrained in the procedures and guidelines as set out by the manufacturer of the BRS."  (*Id.* ¶ 43.)  He also claims that Fourteenth Amendment due process requires that the conditions of confinement have some reasonable relation to the purpose for which persons are committed and that civilly committed persons may only be subjected to liberty restrictions reasonably related to legitimate government objectives and that are not tantamount to punishment.  (*Id.* ¶ 44.)  Plaintiff alleges that Defendants, in their individual and official capacities, "retained, implemented, and

carried out acts and procedures that violated Plaintiff's Fourth and Fourteenth Amendment right to be free from excessive force, and/or use of force and deliberate indifference to Plaintiff's needs, pain and suffering." (*Id.* ¶ 45.) Plaintiff alleges that the unreasonable use of the BRS resulted in physical injuries and emotional harm when the Plaintiff was required by Deputy Phinney, under the direct supervision of Sheriff Litman, to walk more than 40 yards, then up a flight of stairs, then down a 20-foot corridor in the BRS to attend a court hearing while in the Defendants' custody, and that this conduct amounts to punishment in violation of clearly established constitutional rights. (*Id.* ¶¶ 46-47.)

In Count IV, Plaintiff alleges that Defendants in their individual and official capacities, "retained, implemented and carried out acts and procedures violating the Minnesota Constitution and Plaintiff's Fourth and Fourteenth Amendment right to be free from excessive force, and/or use of force and in deliberate indifference to Plaintiff's needs, pain and suffering" when they rendered him vulnerable to physical harm by placing him in a motor vehicle, surrounded by a metal bench seat and metal partitions without any seatbelt protection causing him fear and emotional distress. (*Id.* ¶¶ 50-55, 57.) Specifically, Plaintiff alleges that Defendants, in their individual as well as their official capacities, "are and/or should have each been aware of their responsibility to Plaintiff's safety and constitutional princi[pl]es when Deputy Phinney, under the direct supervision of Sheriff Litman, failed to reasonably protect Plaintiff while in the Defendants' custody" and that Defendants "did nothing to change or to prevent this

conduct and resulting emotional anguish, suffering, and injuries from occurring and actively participated in the cause of the conduct alleged above."  (*Id.* ¶ 56.)

Plaintiff seeks declaratory, injunctive, and monetary relief.  (*Id.* ¶ 7.)

On January 3, 2020, this Court issued a Report and Recommendation recommending that the Complaint be dismissed, save for the claims against Deputy Phinney in his official and individual capacities with respect to Plaintiff's claim under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution. (*See* Dkt. 62.)  On February 18, 2020, United States District Judge Joan N. Ericksen adopted the Report and Recommendation.  (Dkt. 72.)

This matter is now before the Court on Deputy Phinney's Motion for Summary Judgment seeking to dismiss the due process claims against him in his official and individual capacities.

## II.    <u>STANDARD OF REVIEW</u>

Summary judgment is appropriate where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a), (c). As this wording suggests, the initial burden of showing that no genuine issue of material fact exists lies with the movant.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A factual dispute is "material" only if resolving it might affect a suit's outcome under the governing substantive law.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Furthermore, a factual dispute is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citation omitted) ("Where

14

the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'").  When assessing a summary judgment motion, a court should believe the nonmovant's evidence and draw all justifiable inferences in the nonmovant's favor. *Anderson*, 477 U.S. at 255 (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)).

## III.  ANALYSIS

### A.    Official Capacity Claims

Under 42 U.S.C. § 1983, a local government (such as a county government) is subject to § 1983 liability only "if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)); *see also Al-Kadi v. Ramsey Cty.*, No. 16-CV-2642 (JRT/TNL), 2019 WL 2448648, at *15 (D. Minn. June 12, 2019) (quoting *Connick*).  For a governmental entity itself to subject someone to a deprivation, it is not enough that the entity's employees do the depriving: "local governments are responsible only for their own illegal acts," and "are not vicariously liable under § 1983 for their employees' actions." *Connick*, 563 U.S. at 60 (citation and marks omitted); *see also LaBeau v. Sorenson*, No. 18-CV-0651 (NEB/LIB), 2019 WL 7284109, at *5 (D. Minn. Dec. 27, 2019) (quoting *Connick*).  Further "[a] suit against a government official in his or her official capacity is 'another way of pleading an action against an entity of which an officer is an agent.'" *Baker v. Chisom*, 501 F.3d 920, 925 (8th Cir. 2007) (quoting *Monell*, 436 U.S. at 690 n.55); *see also Gorman v. Bartch*, 152 F.3d 907, 914 (8th Cir. 1998) (citation omitted)

("Claims against individuals in their official capacities are equivalent to claims against the entity for which they work.").

A municipal entity's liability can result from "(1) an official municipal policy, (2) an unofficial custom, or (3) a deliberately indifferent failure to train or supervise." *Jackson v. Stair*, 944 F.3d 704, 709 (8th Cir. 2019) (quotation marks omitted) (quoting *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016)); *see also Atkinson v. City of Mountain View*, 709 F.3d 1201, 1214 (8th Cir. 2013) (citations omitted).  To survive summary judgment on a Section 1983 *Monell* claim, a plaintiff must offer evidence sufficient to demonstrate a genuine dispute of material fact that "a municipal policy or custom was the 'moving force [behind] the constitutional violation.'" *Mettler*, 165 F.3d at 1204 (alteration in original) (quoting *Monell*, 436 U.S. at 694); *see also Henderson v. Clark*, CIV. 13-2917 DWF/LIB, 2014 WL 5795030, at *7 (D. Minn. Oct. 1, 2014) (citing *Mettler*, 165 F.3d at 1204), *R.&R. adopted* (D. Minn. Nov. 6, 2014).

With this standard in mind, the Court examines Foster's due process claims against Deputy Phinney in his official capacity as they relate to the St. Louis County Sheriff's Office restraint and transportation policies or customs.

### 1.    Restraint Policy

Deputy Phinney argues that Foster's claims with respect to the restraint policy of the St. Louis County Sheriff's Office fails on the basis that the policy reflects county officials' professional judgment concerning, among other things, the safety of persons in the Sheriff's Office's custody, law-enforcement officers, court staff, and the public, including safety considerations relating to escapes in this case.  (Dkt. 91 at 8.)  Deputy

Phinney further argues that the proper course of action for this Court is to defer to the professional expertise of the Sheriff's Office when evaluating the relationship between Foster's liberty interest in being free from bodily restraint and the government's interest in maintaining safety, and hold that Deputy Phinney's use of restraints pursuant to the Sheriff's Office's policy did not give rise to a violation of Foster's due-process rights. (*Id.* at 9.)  Foster does not make any arguments as to the propriety of the St. Louis County Sheriff's Office's restraint Policy.  (*See* Dkt. 108.)

It should be emphasized that "although the Supreme Court has characterized civil commitment as a significant deprivation of liberty, it has never declared that persons who pose a significant danger to themselves or others possess a fundamental liberty interest in freedom from physical restraint."  *Karsjens v. Piper*, 845 F.3d 394, 407 (8th Cir. 2017) (cleaned up).  Indeed, based on his civil commitment, Foster's "liberty interests are considerably less than those held by members of free society."  *Senty-Haugen v. Goodno*, 462 F.3d 876, 886 (8th Cir. 2006).  This is in part because "confinement in a state institution [raises] concerns similar to those raised by the housing of pretrial detainees, such as the legitimate institutional interest in the safety and security of guards and other individuals in the facility, order within the facility, and the efficiency of the facility's operations."  *Andrews v. Neer*, 253 F.3d 1052, 1061 (8th Cir. 2001); *see also Hall v. Ramsey Cty.*, 801 F.3d 912, 919 (8th Cir. 2015).  Moreover, there is no dispute that the St. Louis County Sheriff's Office has a real, legitimate interest in protecting citizens from harm that could be caused by sexually dangerous persons or persons who have a sexual psychopathic personality.  *See Addington*, 441 U.S. at 426 ("[T]he state . . . has authority

17

under its police power to protect the community from the dangerous tendencies of some who are mentally ill."). Thus, as a civilly committed person, Foster's constitutional rights are not absolute and can be subject to reasonable limitation or retraction based on security concerns. *See Nicolaison v. Milczark*, 26 F. App'x 596, 2002 WL 15669, at *1 (8th Cir. 2002). However, as a person civilly committed to the MSOP, Foster enjoys a protected—but not unlimited—liberty interest in freedom from unnecessary bodily restraint. *See Youngberg v. Romeo*, 457 U.S. 307, 319-20 (1982). "The question then is not simply whether a liberty interest has been infringed but whether the extent or nature of the restraint . . . is such as to violate due process." *Id.* at 320.

Defendant relies heavily on the Eighth Circuit's decision in *Beaulieu v. Ludeman*, 690 F.3d 1017 (8th Cir. 2012), with respect to the validity of the restraint Policy. (Dkt. 91 at 6-9.) In *Beaulieu*, the MSOP instituted a full-restraints policy for transporting patients, which provided that "[p]atients will be transported in full restraints." 690 F.3d at 1031. Full restraints, which included a black box, a wrist chain, and leg irons, were placed on patients anytime that they traveled outside of the secure perimeter and the MSOP made no individualized determination of risk in determining whether to apply the restraints to a particular patient because attempting to do so in the past resulted in an escape attempt. *Id.* The Eighth Circuit in *Beaulieu*, relying on *Youngberg*, found that whether a patient's rights have been violated by a policy "must be determined by 'balancing their liberty interests against the relevant state interests.'" *Id.* at 1031-32 (quoting *Youngberg*, 457 U.S. at 321). In balancing these interests, the Constitution "only requires that the courts make certain that professional judgment in fact was

exercised.  It is not appropriate for the courts to specify which of several professionally acceptable choices should have been made." *Id.* at 1032 (quoting *Youngberg*, 457 U.S. at 321).  Liability is imposed where the decision made by the professional is such a "substantial departure from accepted professional judgment, practice or standards as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Youngberg*, 457 U.S. at 323.  In applying this standard to the MSOP's policy, the Eighth Circuit went on to uphold the blanket restraint policy:

> Here, the Patients "may be correct that the institution could address its security interests with a more tailored policy, but that is not the test." *Id.* at 992. "[N]othing in *Youngberg* suggests that the choice made by the institution must have been the least restrictive alternative available." *Id.* Instead, "*Youngberg* admonishes judges to respect the choices made by professionals at state institutions.  So long as that choice was made by a professional, it is presumptively valid even if it is not the best alternative." *Id.* The Patients "ha[ve] not adduced a single piece of evidence to show that the [MSOP's] transportation policy represents a substantial departure from accepted professional judgment, practice or standards." *Id.* (holding that a Wisconsin institution's blanket policy of placing patients committed involuntarily as sexually violent persons in full restraints during transportation to and from facility was justified by security concerns and did not violate patients' substantive due process right to freedom from bodily restraint where policy was supported by specific instances of aggression by these patients and these patients had been adjudicated dangerous and committed to indefinite term); *see also Semler v. Ludeman*, Civil No. 09–0732 ADM/SRN, 2010 WL 145275, at *27 (D. Minn. Jan. 8, 2010) ("Given the rationale for the use of restraints, deemed necessary for safety reasons in light of the growth of the MSOP program, and possibly in response to an escape attempt . . . , it cannot be said that Defendants' actions are arbitrary or shocking to the conscience.").  The MSOP's articulated reasons for using full restraints are for the safety of the public and staff and to prevent escapes and attempted escapes, which have occurred at MSOP facilities.  We conclude that such policy is a proper exercise of the DHS officials' professional judgment.

*Id.* at 1032-33 (alterations in original).

Foster does not dispute that he was committed as a "sexually dangerous person" and as "a sexual psychopathic personality" during the relevant time period.  (Dkt. 1 ¶ 8; 92-1; Dkt. 92-2; Dkt. 109 ¶ 6.)  Pursuant to the MTCA, the phrase "sexually dangerous person" is defined as:

> a person who:
>
> (1) has engaged in a course of harmful sexual conduct as defined in subdivision 8;
>
> (2) has manifested a sexual, personality, or other mental disorder or dysfunction; and
>
> (3) as a result, is likely to engage in acts of harmful sexual conduct as defined in subdivision 8.
>
> (b) For purposes of this provision, it is not necessary to prove that the person has an inability to control the person's sexual impulses.

Minn. Stat. § 253D.02, subd. 16.

> The phrase "sexual psychopathic personality" is defined as follows:
>
> the existence in any person of such conditions of emotional instability, or impulsiveness of behavior, or lack of customary standards of good judgment, or failure to appreciate the consequences of personal acts, or a combination of any of these conditions, which render the person irresponsible for personal conduct with respect to sexual matters, if the person has evidenced, by a habitual course of misconduct in sexual matters, an utter lack of power to control the person's sexual impulses and, as a result, is dangerous to other persons.

Minn. Stat. § 253D.02, subd. 15.[2]

The rationale for the full restraints during transports and court proceedings other than trials is to protect the safety of persons in the Sheriff's custody, law-enforcement

---

[2]    The Court notes that these sections were renumbered in 2013, however, the substance did not materially change.

officers, court staff, and the public.  (Dkt. 94 ¶¶ 10-11.)  It was noted that the St. Louis County Sheriff's Office has had at least one transport-related escape attempt.  (*Id.* ¶ 10.)

Despite being classified as a "sexually dangerous person" and as "a sexual psychopathic personality," Foster asserts that he is not considered to be a "dangerous person" and has never attempted escape.  (Dkt 109 ¶¶ 7-8.)  However, the Eighth Circuit has concluded that an institution need not address its security interests with a more tailored policy and instead requires that a policy be the product of "professional judgment" that does not represent "a substantial departure from accepted professional judgment, practice or standards."  *Beaulieu*, 690 F.3d at 1032.  The restraint policy at issue in *Beaulieu* was found to be the result of MSOP officials' professional judgment relating to "the safety of the public and staff" and the prevention of "escapes and attempted escapes."  *Id.* at 1033.  Similarly, as set forth above, the restraint Policy in this case reflected St. Louis County Sheriff's Office officials' professional judgment concerning, among other things, the safety of its personnel, court personnel, and of the public, as well as an attempted escape.  (Dkt. 94 ¶¶ 10-11.)  To the extent that Foster complains that he was also restrained before the court on August 3, 2015, there was nothing in the Policy preventing the judge from releasing him from the restraints during his hearing.  (Dkt. 94-1 at 2-3.)

Further, Foster has provided the Court with no competent evidence that the restraint Policy is "a substantial departure from accepted professional judgment, practice or standards."  *See Beaulieu*, 690 F.3d at 1032 (finding that plaintiffs had "not adduced a single piece of evidence to show that the [MSOP's] transportation policy represent[ed] a

21

substantial departure . . . .").  Indeed, given the similarity between the MSOP's policy

that was upheld in *Beaulieu* and the present Policy at issue, the Court cannot, based on

the evidence before it, find that a reasonable jury would find that the Policy was a

substantial departure from accepted professional judgment, practice, or standards.

Given the undisputed evidence before the Court that the Policy is not a substantial

departure from accepted professional judgment, practice, or standards, the Court defers to

the professional expertise of the St. Louis County Sheriff's Office officials in finding that

the infringement of Foster's liberty interests due to his restraint did not violate due

process.  *See Beaulieu*, 690 at F.3d at 1032-33.  Consequently, the Court recommends

granting summary judgment with respect to the official capacity claims against Deputy

Phinney in relation to the restraint Policy.[3]

### 2.    Transportation Without Seat Belts or Other Safety Restraints

There is no dispute that Saint Louis County has a policy of transporting prisoners

without securing them with safety restraints such as seat belts.

"The Eighth Circuit has determined that MSOP's civil detainees are most similar

to pretrial detainees for the purpose of assessing constitutional protections."  *Meyer v.

Stacken*, No. 17-CV-1761 (ADM/KMM), 2019 WL 4675353, at *3 (D. Minn. July 25,

2019) (citing *Serna v. Goodno*, 567 F.3d 944, 948 (8th Cir. 2009)), *R.&R. adopted*, 2019

WL 4673941 (D. Minn. Sept. 25, 2019).  In turn, the Eighth Circuit in *Spencer v.*

---

[3]    The Court also notes that because it has determined that Deputy Phinney is entitled to qualified immunity with respect the restraint claims against him in his individual capacity (*see infra*, Section III.B), this is another basis for why the official capacity defendants (Deputy Phinney and/or St. Louis County) cannot be subject to § 1983 liability.  *See Cooper v. Martin*, 634 F.3d 477, 482 (8th Cir. 2011).

*Knapheide Truck Equipment Co.*, dealing with the transportation of a pretrial detainee, observed that "[t]he Supreme Court has held that pretrial detainees are entitled under the Fourteenth Amendment to 'at least as great' protection as that afforded convicted prisoners under the Eighth Amendment." 183 F.3d 902,906 (8th Cir. 1999) (quoting *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983)). "[A] prisoner's Eighth Amendment rights are violated when government entities or officials are deliberately indifferent . . . to his or her safety." *Id.* at 905 (citing *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)). A government entity or official "cannot be found guilty of deliberate indifference unless it is shown that he "knew of and disregarded an excessive risk to [an individual's] health or safety.'" *Liebe v. Norton,* 157 F.3d 574, 577 (8th Cir. 1998) (cleaned up) (quoting *Farmer*, 511 U.S. at 837). "Deliberate indifference requires 'more than mere negligence,' but does not require acting 'for the very purpose of causing harm or with knowledge that harm will result.'" *Brown v. Fortner*, 518 F.3d 552, 558 (8th Cir. 2008) (quoting *Farmer*, 511 U.S. at 835).

In *Spencer*, a pretrial detainee asserted a § 1983 claim against the Board of Police Commissioners of Kansas City, Missouri (the "Board") for injuries suffered allegedly resulting from the Board's "official policy of purchasing and using patrol wagons that were inherently unsafe" because the patrol wagons had "no seatbelts or other safety restraint devices installed in the compartment." 183 F.3d at 904. The pretrial detainee was handcuffed, while intoxicated, and placed in the rear of a patrol wagon, and into a prisoner compartment. *Id.* During his transport in the patrol wagons, the pretrial detainee "claims he was thrown forward into the bulkhead of the compartment causing

severe injuries and rendering him a quadriplegic." *Id.* The Eighth Circuit held that "the Board's purchase of patrol wagons without safety restraints **nor its manner of transporting individuals in these wagons** were policies that obviously presented a 'substantial risk of serious harm.'" *Id.* at 906 (emphasis added). "Though these guidelines may not have been adequate to prevent injuries, their failures, if any, constitute negligence at most" and did not rise to the level of deliberate indifference. *Id.* In addition, the Eighth Circuit found that although the Board was aware of previous complaints of injuries sustained during transport, "the complaints d[id] not establish that the Board was deliberately indifferent to conditions that posed a substantial risk of serious harm." *Id.* Thus, the Eighth Circuit held there was no due process violation.

Foster attempts to distinguish *Spencer* on a number of grounds, including that the plaintiff in *Spencer* was only handcuffed; the plaintiff in *Spencer* was intoxicated; there was no policy in place in this case regarding the safe use of the vehicle like there was in *Spencer*; that as a civilly committed individual, Foster should have received fairer treatment than a convicted felon in *Spencer*; and that the miles traveled may have been less in *Spencer*.[4] (Dkt. 108 at 9-13.) These arguments are of no avail. With respect to

---

[4]   While it is not entirely clear, Foster appears to be attempting to create a dispute of fact by relying on St. Louis County Sheriff's Office's policy showing that employees are required to wear seat belts and to ensure that their passengers wear seat belts pursuant to Minnesota law. (Dkt. 108 at 7; Dkt. 109-1 at 11.) However, Foster fails to include the St. Louis County Sheriff's Office's policy that "[d]esignated prisoner transport vans shall be exempt from seat belt use to the extent that Minnesota State Law allows." (Dkt. 92-8 at 9.) Regardless, the Eighth Circuit has held that "[v]iolations of state law do not state a claim under 42 U.S.C. § 1983." *Doe v. Gooden*, 214 F.3d 952, 955 (8th Cir. 2000); *see also Phillips v. Norris*, 320 F.3d 844, 847 (8th Cir. 2003) (citation omitted) ("[T]here is no federal constitutional liberty interest in having state officers follow state law or prison officials follow prison regulations.").

his status as a civilly committed patient, as set forth above, MSOP's civil detainees are most similar to pretrial detainees and the plaintiff in *Spencer* was a pretrial detainee. *See Serna*, 567 F.3d at 948; *Spencer*, 183 F.3d at 906.  Further, if anything, the intoxication of the plaintiff in *Spencer* made the transportation by officials in that case more egregious than here, where Foster was not impaired.  As to Foster's assertion that there was no policy in place regarding the safe use of the vehicle, like there was in *Spencer*, that assertion is contradicted by undisputed evidence in the record, namely the policies and procedures of the St. Louis County Sheriff's Office that deputies must observe all traffic laws unless they are responding to an emergency and are required to undergo annual training courses pertaining to the importance of safe driving, including sections such as defensive driving, distracted driving, and the concepts of reckless disregard and negligence in the context of driving.  (Dkt. 94 ¶¶ 21-23.)  Deputy Phinney completed driving training a number of times, including five months before Foster's transport to the St. Louis County courthouse.  (*Id.* ¶ 24; Dkt. 94-3.)  Foster's argument regarding traveling 83 miles each way and the fact that he was subject to leg irons does not change the calculus with regard to whether the policy's inadequacy was so obvious, and that the inadequacy was so likely to result in the violation of constitutional rights, that the policymakers can reasonably be said to have been deliberately indifferent, especially in light of the fact that the St. Louis County Sheriff's Office had no previous incidents regarding transport or injuries with respect to leg irons, even with respect to the use of vans with prisoner compartments, prior to August 3, 2015.  (Dkt. 94 ¶¶ 15-16; Dkt. 113 ¶¶ 7-10.)  While Foster finds this assertion incredulous (Dkt. 108 at 10-11), he offers no

evidence that the St. Louis County Sheriff's Office knew of incidents involving not using safety restraints in vans with compartments or that they had information that other departments were having problems with injuries prior to Foster himself was injured. Indeed, in this regard, the facts in *Spencer* are more egregious than here:

> Spencer claims that the Board's deliberate indifference is also illustrated by the fact that prior to his arrest, the Board had notice, in the form of citizen complaints filed with the Board's Office of Citizen Complaints, that injuries were occurring to individuals during transport in the patrol wagons. The record shows that, with the exception of one detainee who was taken to the hospital, the complaints refer to minor injuries or allegations of being tossed about the compartment without any resulting injuries. In short, we find that the complaints do not establish that the Board was deliberately indifferent to conditions that posed a substantial risk of serious harm.

*Spencer*, 183 F.3d at 906. While St. Louis County Sheriff's Office's safe driving requirements may not have been adequate to prevent injuries using the van without safety restraints, its failures, if any, constitute negligence at most, which is not actionable as a § 1983 claim, rendering summary judgment appropriate. *See id.* As such, the Court recommends granting summary judgment with respect to the official capacity claims related to transportation.[5]

---

[5]      The Court also notes that the purpose of not restraining individuals during transport is because transported persons could use the buckles and straps to harm themselves, other transported persons, and officers, and that if officers had to enter the compartments to assist prisoners with seatbelts or other safety restraints, the officers, and their equipment, including weapons, could be placed in a vulnerable position. (Dkt. 94 ¶¶ 17-18.) The court finds that the policy is based on proper professional judgment regardless of the other acceptable choices. *See Youngberg*, 457 U.S. at 321. Foster has provided no evidence that this policy is "a substantial departure from accepted professional judgment, practice or standards," *see Beaulieu*, 690 F.3d at 1032, and the lack of injuries related to transport in van compartments since 2009 through the date of this incident (Dkt. 113 ¶¶ 9-10), with the only other injury occurring to an individual in June 2017 (Dkt. 92-6), supports a finding that the policy is based on professional judgment. *Spencer*, 183 F.3d at 906 (noting that the municipality in that case had

**B.    Claims Against Deputy Phinney in his Individual Capacity**

Deputy Phinney argues that the claims against him in his individual capacity should be dismissed on summary judgment because he is entitled to qualified immunity. (Dkt. 91 at 16-17, 21-22.)

The Supreme Court recently laid out qualified immunity's parameters as follows:

Under our precedents, officers are entitled to qualified immunity under § 1983 unless (1) they violated a federal statutory or constitutional right, and (2) the unlawfulness of their conduct was "clearly established at the time." "Clearly established" means that, at the time of the officer's conduct, the law was "'sufficiently clear' that every 'reasonable official would understand that what he is doing'" is unlawful. In other words, existing law must have placed the constitutionality of the officer's conduct "beyond debate." This demanding standard protects "all but the plainly incompetent or those who knowingly violate the law."

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent. The rule must be "settled law," which means it is dictated by "controlling authority" or "a robust 'consensus of cases of persuasive authority.'" It is not enough that the rule is suggested by then-existing precedent. The precedent must be clear enough that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. Otherwise, the rule is not one that "every reasonable official" would know.

The "clearly established" standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him. The rule's contours must be so well defined that it is "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." This requires a high "degree of specificity." We have repeatedly stressed that courts must not "define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced." A rule is too general if the unlawfulness of the officer's conduct "does not follow immediately from the conclusion that [the rule] was firmly established."

received a number of complaints of injuries, including one injury that led to a detainee's hospitalization).

*D.C. v. Wesby*, 138 S. Ct. 577, 589-90 (2018) (internal citations omitted). A government official is entitled to qualified immunity unless "both of these questions are answered affirmatively." *Greenman v. Jessen*, 787 F.3d 882, 887 (8th Cir. 2015) (marks and citation omitted). Given this standard, the Court will proceed with determining whether Deputy Phinney is entitled to qualified immunity with respect to Foster's due process restraint and transportation claims.

### 1. Claims Related to Foster's Restraint by Phinney

As previously stated, given the finding by the State that Foster should be civilly committed due to his danger to society, the restraint policy was a constitutionally proper product of professional judgment of the St. Louis County Sheriff's Office. (*See supra*, Section III.A.1.) Thus, the actual use of the full restraints by Deputy Phinney was not improper. An excessive force claim by an involuntarily committed patient is analyzed under the same "objective reasonableness" standard as a pretrial detainee or an arrestee. *See Andrews*, 253 F. 3d at 1060-61. To succeed on an excessive force claim under the Due Process Clause, "[a] pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." *Kingsley v. Hendrickson*, 576 U.S. 389, 396-97 (2015). This analysis "turns on the 'facts and circumstances of each particular case.'" *Id.* at 397 (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)). The court may consider a number of non-exhaustive factors in its analysis, including, but not limited to:

> [T]he relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem

at issue; the threat reasonably perceived by the officer; and whether the plaintiff is actively resisting.

*Id.*

A court "must also account for the legitimate interests that stem from the government's need to manage the facility in which the individual is detained, appropriately deferring to policies and practices that in the judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." *Id*. (marks and citation omitted). Further, the court must judge the reasonableness of the force used from the perspective and with the knowledge of the defendant officer. *See id*.

While there is no dispute that Foster communicated to Deputy Phinney that the leg iron restraints were "tight" or "awfully tight" (Dkt. 109 ¶¶ 22, 26), nowhere does Foster assert that he complained to Deputy Phinney that he was in pain nor is there any assertion in the competent evidence demonstrating that he showed signs that he was in pain (*i.e.*, difficulty walking) during the relevant period so as to provide a reasonable officer notice that he should have adjusted the leg irons to avoid injury. (*See generally* Dkt. 109.) Further, Foster made no requests for removal or loosening of the restraints before the judge at his August 3, 2015 hearing, nor any other complaints related to his transport. (*See* Dkt. 92-4.) Indeed, such additional information may be necessary to succeed on an excessive force claim, as the Eighth Circuit has acknowledged that restraints "almost inevitably will result in some irritation, minor injury, or discomfort[.]" *Chambers v. Pennycook*, 641 F.3d 898, 907 (8th Cir. 2011) (marks and citations omitted). Moreover, as it relates to use of restraints, "for the application of handcuffs to amount to excessive

force, there must be something beyond minor injuries."[6] *Stepnes v. Ritschel*, 663 F.3d 952, 961 (8th Cir. 2011). Courts within this District have concluded that "in cases like these, where a plaintiff alleges that officials applied handcuffs too tightly and then ignored the plaintiff's complaints of pain, there must be some proof, usually in the way of medical records, **showing the plaintiff suffered long-term injury as a result of the handcuffing**." *Ivey v. MSOP*, No. 12-CV-30 (DWF/TNL), 2020 WL 3064720, at *4 (D. Minn. May 20, 2020) (emphasis added), *R.&R. adopted sub nom. Ivey v. Williams*, 2020 WL 3060782 (D. Minn. June 9, 2020); *see also Powell v. Staycoff*, No. 17CV03018ECTSER, 2019 WL 2524771, at *8 (D. Minn. June 19, 2019) ("In fact, the Eighth Circuit has expressly held that being handcuffed too tightly is not tantamount to excessive force in the absence of medical records indicating any long-term injury as a result of the handcuffs. Powell has not provided any such medical records. Accordingly, his § 1983 claims will be dismissed to the extent they are predicated on the excessive force of too-tight handcuffs.") (cleaned up). Here, Foster noted that he sought medical attention for the "abrasions" he suffered. (Dkt. 92-13.) He provided no other evidence of treatment he received as result of the transport, nor does it appear that he produced any documents demonstrating his injuries. (Dkt. 94 ¶¶ k-m; Dkt. 92-13 at 6, 8-11.) The

---

[6] The Court notes that while the Eighth Circuit in *Chambers* rejected the contention that the presence of only de minimis injury forecloses an excessive force claim, *Chambers*, 641 F.3d at 906-07, the Eighth Circuit in *Stepnes* concluded that in the context of restraints, such as handcuffs, "*Chambers* simply reaffirmed our previous holdings that '[f]or the application of handcuffs to amount to excessive force, there must be something beyond minor injuries.'" *Stepnes*, 663 F.3d at 961 (quoting *Chambers*, 641 F.3d at 907) (citation omitted). The Court finds no basis to distinguish between the application by an officer of handcuffs versus the application of leg irons for the purpose of requiring "something beyond minor injuries."

incident report stated that Foster had an open sore with some blood and a vertical mark, and that Foster had applied "Band Aides." (Dkt. 92-5.) While the sores may amount to an unfortunate minor injury, there is no evidence (such as through medical documents) of any long-term injury relating to the use of the leg irons.[7] Given the institutional interests,

---

[7] Foster asserts that the motion for summary judgment is premature because there are pending discovery motions seeking to compel discovery and that due to COVID-19 he has not been able to obtain his medical records. (Dkt. 108 at 1-2.) However, there were no discovery motions pending at the time Defendant's Motion for Summary Judgment was initially filed. While Plaintiff's Request for Modification of the Scheduling Order to Extend Discovery Time and Request for Hearing (Dkt. 85) and an identical filing (except for the filing date) (Dkt. 100) were filed before and after the Motion for Summary Judgment was initially filed, the Court denied the motions to extend the time for discovery due to a lack of diligence on the part of Foster:

> Accordingly, Plaintiff's request falls on the eve of summary judgment, a month after the deadline to bring non-dispositive motions (including those relating to the schedule), nearly two months after the extended discovery deadline of April 30, 2020, and approximately six months after the Court extended the schedule at Plaintiff's request on January 3, 2020. (*See* Dkt. 63.) It appears Plaintiff has not taken any meaningful action to prosecute his case and conduct fact discovery between the January 3 Order extending the schedule and the April 30, 2020 close of discovery. (Dkt. 106 ¶ 2.)

> Moreover, to the extent Plaintiff relies on the COVID-19 pandemic, he has not explained why he did not engage in any discovery between January 3, 2020 and March 13, 2020—the date the lockdown at the MSOP facility began in response to the COVID-19 pandemic. (Dkt. 85 at 1; Dkt. 100 at 1.) The lockdown would not have affected Plaintiff's discovery efforts until mid-March, and does not excuse his apparent inaction prior to this time. Further, as Defendants point out, Plaintiff has not explained how, if at all, the lockdown has impeded his ability to conduct written discovery or, for that matter, request any relief from the Court (*i.e.*, via the mail). Further, while Plaintiff focuses on the need to extend discovery to take depositions, he never sought permission of the Court to take any depositions—which the scheduling orders required him to do—and still had not demonstrated that any depositions are necessary.

the facts available to Deputy Phinney during the incident in question, and that the available undisputed evidence record demonstrates that Foster did not suffer a long term-injury related to the restraints, the Court recommends dismissal of the excessive force claims against Deputy Phinney in his individual capacity.

### 2.    Claims Related to Foster's Transportation by Phinney

Deputy Phinney argues that at the very least, he did not violate Foster's clearly established constitutional rights with respect to transporting him in a wagon compartment without safety restraints.  (Dkt. 91 at 21-22.)  For purposes of the qualified immunity analysis, a right is clearly established "if its contours were sufficiently definite that any reasonable official in [the defendant's] shoes would have understood that he was violating it, meaning that existing precedent placed the statutory or constitutional question beyond debate."  *City & Cty. of S.F., Cal. v. Sheehan*, 135 S. Ct. 1765, 1774 (2015) (quotations, citations, and alterations omitted).  The key inquiry into the law of the controlling jurisdiction or the consensus of cases of persuasive authority is "whether it would have been clear to a reasonable officer in the defendant's position that their conduct was unlawful in the situation they confronted."  *Wood v. Moss*, 572 U.S. 744, 758 (2014) (cleaned up); *Jacobson v. McCormick*, 763 F.3d 914, 918 (8th Cir. 2014) (citing *Wilson v. Layne*, 526 U.S. 603, 617(1999)).  In other words, "[t]he salient question is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional."  *Tolan v. Cotton*, 572 U.S.

_____

(Dkt. 111 at 8-9 (footnote omitted).)  Given that this Court has already held that Foster was not entitled to an extension of fact discovery, the Court finds that the motion for summary judgment is not premature.

650, 656 (2014) (cleaned up).  "There is no requirement that the very action in question has previously been held unlawful, but rather, in the light of pre-existing law the unlawfulness must be apparent." *Vaughn v. Ruoff*, 253 F.3d 1124, 1129 (8th Cir. 2001) (cleaned up).  This exacting standard "gives government officials breathing room to make reasonable but mistaken judgments about open legal questions" by protecting "all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011) (cleaned up).  In light of this Court's analysis with respect to *Spencer*, and the propriety of the St. Louis County Sheriff's Office's policy of transporting without seat belts or other safety restraints (*see supra,* Section III.A.2), the Court finds that there was no fair warning to Deputy Phinney that Foster's transport was unconstitutional.  As such, summary judgment should be granted under the doctrine of qualified immunity with respect to transportation-related due process claims against Deputy Phinney in his individual capacity.

## IV.    <u>RECOMMENDATION</u>

Based on the above, and on the files, records, and proceedings herein, **IT IS RECOMMENDED** that:

1.    Defendant Mark Phinney's Motion for Summary Judgment (Dkt. 88) be **GRANTED**.

2.    Plaintiff's due process claims be **DISMISSED WITH PREJUDICE**.


DATED: January 20, 2021                              *s/Elizabeth Cowan Wright*
                                                     ELIZABETH COWAN WRIGHT
                                                     United States Magistrate Judge

## <u>NOTICE</u>

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).